**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| BERKELEY*IEOR d/b/a B*IEOR, a Nevada Corporation,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>TERADATA OPERATIONS, INC. and W.W. GRAINGER, INC.,<br><br>　　　　　Defendants. | Case No. _____<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Berkeley*IEOR d/b/a B*IEOR ("B*IEOR"), a Nevada corporation, for its Complaint against Defendants Teradata Operations, Inc. ("Teradata") and W.W. Grainger, Inc. ("Grainger") (collectively, "Defendants") states as follows:

## NATURE OF THE ACTION

1.　　　This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 1 et seq., including 35 U.S.C. §§ 271, 281, 283, 284, and 285.

## THE PARTIES

2.　　　B*IEOR is a corporation organized under the laws of the state of Nevada with its principal place of business in Charlevoix, Michigan.

3.　　　Teradata Operations, Inc. is a corporation organized under the laws of the state of Delaware with its principal place of business at 10000 Innovation Drive, Dayton, Ohio 45342.

4.　　　Grainger is a corporation organized under the laws of the state of Illinois with its principal place of business at 100 Grainger Parkway, Lake Forest, Illinois 60045.

## JURISDICTION AND VENUE

5.      This is an action for patent infringement arising under the patent laws of the United States, Title 35, United States Code. This Court has exclusive subject matter jurisdiction over this case for patent infringement under 28 U.S.C. §§ 1331 and 1338.

6.      This Court has personal jurisdiction over Defendants Teradata and Grainger and venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1400(b).

7.      Teradata maintains and has maintained a regular and established place of business in this District. This includes, among other things, Teradata's fixed, physical office location at 20 North Upper Wacker, 12th Floor, Chicago, IL 60606, where Teradata employees regularly operate and service Teradata clients within this District.

8.      Teradata has committed acts of patent infringement giving rise to this action within the State of Illinois and this District, through, among other things, its engagement with and activities involving Grainger as set forth in this Complaint.

9.      Teradata maintains and/or has maintained a registered agent for service of process on record with the Illinois Office of The Secretary of State at CT Corporation System, 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604.

10.     Grainger is a corporation organized under the laws of the state of Illinois. Grainger maintains a regular and established place of business at its world headquarters at 100 Grainger Parkway, Lake Forest, Illinois 60045.

11.     Grainger has committed acts of patent infringement giving rise to this action within the State of Illinois and this District as set forth in this Complaint.

## THE ASSERTED PATENTS

**A.    The Three Asserted Patents.**

12.    On September 29, 2009, the United States Patent and Trademark Office duly and legally issued U.S. Patent Number 7,596,521 (the "'521 Patent"), entitled "Process for Determining Object Level Profitability." A true and correct copy of the '521 Patent is attached as Exhibit A to this Complaint.

13.    On February 1, 2011, the United States Patent and Trademark Office duly and legally issued U.S. Patent Number 7,882,137 (the "'137 Patent"), entitled "Process for Determining Object Level Profitability." A true and correct copy of the '137 Patent is attached as Exhibit B to this Complaint.

14.    On December 17, 2013, the United States Patent and Trademark Office duly and legally issued U.S. Patent Number 8,612,316 (the "'316 Patent"), entitled "Process for Determining Object Level Profitability." A true and correct copy of the '316 Patent is attached as Exhibit C to this Complaint.

15.    The '521 Patent, '137 Patent and '316 Patent are collectively referred to herein as the "Asserted Patents."

**B.    Ownership of the Asserted Patents.**

16.    Richard "Tad" Lepman is the named inventor of each of the Asserted Patents.

17.    On or around April 7, 2000, Mr. Lepman assigned all rights, title and interest in and to the Asserted Patents to Berkeley*IEOR, a California corporation ("B*IEOR California").

18.    In or around December 2002, B*IEOR California was succeeded by Plaintiff B*IEOR, a newly formed Nevada corporation.

19.     B*IEOR is presently the owner and assignee of each of the Asserted Patents and has the exclusive right to sue for and recover all past, present, and future damages for infringement of the Asserted Patents.

20.     In 2008, B*IEOR moved its original principal place of business to Charlevoix, Michigan.

**C.     The Improvement Needed for Accurately Measuring Profit Contribution.**

21.     Prior to the filing of the Asserted Patents, businesses struggled to accurately measure profit contribution at a resolution necessary to make strategic decisions. A company's best resource for understanding its profits came from financial statements—typically compliant with Generally Accepted Accounting Principles (GAAP)—such as balance sheets, income or loss and cash flow financial statements. Such traditional financial statements reported on profits in the aggregate – e.g., subsidiary-wide or possibly division-wide.

22.     Such aggregated information led to blindness regarding the profit contribution measures necessary to implement account, product, or customer level decision making, particularly in large businesses with many millions of accounts, items sold, or customers.

23.     To address these deficiencies, the Asserted Patents disclose calculating profitability associated with the smallest common component of profit measurement desired—namely, the profit "object."

24.     Examples of profit measurement objects referenced in the Asserted Patents' specifications include an insurance company using a "policy" object, a bank using an "account" object, and an airline using a "seat" object as a profit object. Expanding on an airline "seat" object example, the claimed inventions enable an airline to determine profitability at the "seat" level— each seat of each segment of each flight of each origin or destination.

25. The inventions of the Asserted Patents provide management a single version of the truth when evaluating multiple dimensions of profitability (such as product, account, customer, or item), which was not possible before.

**D.    The Technological Improvements Needed to Determine Object Level Profitability on a Massive Scale.**

26. Prior to the filing date of the Asserted Patents, others attempted to calculate certain profitability-related measures for individual customer accounts on a limited scale, either manually, or sometimes through traditional procedural-based computer software with limited success.

27. However, due to technical limitations associated with relying primarily on traditional procedural-based software (e.g., using conventional if, then, else statements), such prior attempts could not provide sufficient flexibility or the capability to simultaneously support the number of calculation permutations required to achieve the functionality made possible by the present invention, much less within the time needed.

28. Concepts disclosed in the Asserted Patents include, among others, allowing multiple profitability factors to be processed independently and simultaneously by a relational database management system (RDBMS), resulting in significantly improved performance.

29. Thus, the Asserted Patents disclose and claim not only the idea of determining object level profitability, but also recite limitations directed to employing unconventional technological solutions to these technological problems encountered by the prior art.

30. In particular, the Asserted Patents claim unconventional uses of relational database management techniques, independent and simulations calculation techniques, and combinations of rules and data in a mathematical set theoretic framework that improve upon the capabilities, performance, and scalability (ability to maintain performance as the number of users and volume

of data grows) of traditional procedural-based computer software, which largely relies on sequential and iterative processing and logic.

31.    These claimed features make it possible to achieve a technologically scalable solution capable of measuring profit at a level of precision, resolution, and speed not possible in prior computerized financial performance measurement processes.

## BACKGROUND FACTS

**A.    Mr. Lepman's Conception of The Inventions of the Asserted Patents.**

32.    B*IEOR's relationship with Teradata dates back to the 1990s when Teradata's predecessor, NCR Corporation ("NCR"), engaged B*IEOR to provide consulting services.

33.    During this timeframe, NCR was in the business of, among other things, building and developing database hardware and software computing solutions.

34.    B*IEOR's consulting services specialized in the design and development of large scale decision support solutions.

35.    In or around 1998, B*IEOR's president, Richard "Tad" Lepman (also the named inventor of the Asserted Patents), conceived the functional and technical ideas behind the inventions claimed in the Asserted Patents while strategizing on and designing an improved profitability measurement solution both NCR and B*IEOR could bring to market. NCR was interested in marketing a solution of this type to clients in the retail banking industry and B*IEOR was interested in marketing it to clients outside the retail banking industry.

36.    B*IEOR and NCR worked together in building the first commercial embodiment of Mr. Lepman's inventions, which Royal Bank of Canada ("RBC") implemented in April 1999. This commercial embodiment received much industry acclaim and was ultimately named "Value Analyzer" or "Teradata Value Analyzer" (hereinafter, "TVA").

37.     On April 9, 1999, the same month RBC's implementation of TVA went live, Mr. Lepman filed the provisional application with the USPTO to which the Asserted Patents claim priority.

**B.     The Limited Field of Use License Not at Issue in This Case.**

38.     On or around June 1, 1999, B*IEOR and NCR executed a license agreement ("License Agreement") under which B*IEOR licensed NCR for limited uses of B*IEOR and/or Mr. Lepman's inventions.

39.     B*IEOR, however, licensed NCR only for certain activities falling within a stated field of use ("Limited Field of Use") expressly limited to, among other things, direct sales to NCR clients that derive the majority of their annual gross revenue from retail financial services ("Retail Banking Businesses"). In other words, certain implementations of TVA concerning Retail Banking Businesses fall within NCR's Limited Field of Use, while other implementations do not.

40.     Defendant Grainger is not, and has never been, a Retail Banking Business and, thus, at least the Grainger TVA implementation at issue here falls outside the Limited Field of Use.

41.     As a result, the Counts of this Complaint arise from Defendants' infringement under the patent laws of the United States rather than the License Agreement confined to the Limited Field of Use.

**C.     Teradata's TVA Implementations Outside the Limited Field of Use.**

42.     In 2007, NCR spun off its data warehousing business into a separate legal entity. Defendant Teradata formed as a result of this spin-off.[1]

---

[1] B*IEOR denies that Teradata and/or its parent company acquired NCR's rights under the License Agreement. Still, whether Teradata did or did not acquire NCR's rights is of no moment here. B*IEOR does not allege or seek remedies for acts of patent infringement falling within the Limited Field of Use in this Complaint, nor does B*IEOR allege here that any party has breached the License Agreement.

43.     On or around September 29, 2009, B*IEOR sent a letter to Teradata announcing the issuance of the '521 Patent. (See Ex. D, Correspondence from B*IEOR to Teradata). In that letter, B*IEOR asked for a meeting with Teradata to discuss its ongoing sales of the TVA, particularly those falling outside the Limited Field of Use.

44.     In July 2010, the parties met in-person to discuss, among other things, the '521 Patent and then-existing implementations of TVA. During that meeting, Teradata took the position that it and some of its customers did not perform certain steps recited in the claims of the '521 Patent and that other customers fell within the Limited Field of Use.

45.     B*IEOR has since learned that this is not the case, at least for subsequent implementations of TVA, such as by Grainger.

46.     In or around 2012, Teradata partnered with Grainger and implemented, among other things, the "Teradata Value Analyzer software." (See Ex. E, Grainger Press Release at p. 1).

47.     Grainger's implementation allocates to "the lowest profit object." (Ex. F, Grainger Case Study at p. 2).

48.     Teradata's website publishes a video recording of a September 2013 slide presentation (the "2013 Teradata–Grainger Presentation")[2] discussing the benefits promoted by Teradata and enjoyed by Grainger through their implementation of TVA and use of the inventions of the Asserted Patents.

---

[2] As of the date of this Complaint, the 2013 Teradata–Grainger Presentation is available at www.teradata.com/Resources/Web-Casts/Leveraging-Profitability-to-Drive-Business-Growth/?LangType=1033&LangSelect=true.



(2013 Teradata–Grainger Presentation).

49.     The 2013 Teradata–Grainger Presentation refers to the TVA's ability to "measur[e] the profitability of any object (account, customer, product, organization, etc.)" for a "Robust, Scalable Consistent Single View of Detailed Profitability."



(2013 Teradata–Grainger Presentation).

50.     Teradata reports that Grainger saw a return on its investment within four months and soon brought in an additional $80 million in revenue as a result of the project. (Ex. F at p. 2).

9

## COUNT I - DIRECT INFRINGEMENT OF THE ASSERTED PATENTS

51.     The allegations set forth in the foregoing paragraphs 1 through 50 are hereby re-alleged and incorporated by reference.

52.     In violation of 35 U.S.C. §271(a), Defendants have infringed at least Claims 1 – 4 of the '521 Patent, Claims 1 and 2 of the '137 Patent and Claims 1 and 2 of the '316 Patent (hereinafter, the "Asserted Claims")[3] by making, using, offering for sale, selling and/or importing the inventions claimed.

53.     Defendants have infringed by performing the steps recited in the Asserted Claims in connection with their usage of the TVA and related activities.

54.     By way of example, and as exemplified by the following statements, at least Grainger performs a process for determining object level profitability as recited in the Asserted Claims of the '316 and '521 Patents and a process for transforming a computerized profit database as recited in the Asserted Claims of the '137 Patent:

> Teradata . . . partnered with [Grainger] . . . "to implement new analytics capabilities utilizing Teradata's Active Enterprise Data Warehouse (EDW) platform and Teradata Value Analyzer software."

(Ex. E at p. 1);

> Teradata Value Analyzer (TVA) is Teradata's tool for calculating the profit contribution for all of a company's accounts, customers, relationships or other entities. This gives the management team the valuable information needed to understand and affect the profit dynamics of the business.

(Ex. G, TVA Technical Overview, at p. 3);

> The lowest level of detail at which TVA will calculate profitability. This may be a bank customer's checking account, airline's passenger name record or a shipping company's package. A base profit object may or may not be related to an associate profit object (defined below).

---

[3] B*IEOR reserves the right to assert additional claims beyond the Asserted Claims identified in this complaint.

(Ex. G at p. 3).

55.     Defendants practice the claimed step of providing a computerized profit database having profit information, as recited in the Asserted Claims of the '137 and '316 Patents.

56.     By way of example, at least Grainger generates, furnishes, supplies, makes available, and/or prepares factual profit data used for TVA processing:

> There is a series of tables containing the client's operational data. This is the actual data from the client's systems of record and it is used to drive the profitability calculations. For example, if the client has 30 million accounts and 15 million customers, these tables may be populated with the following types of information: . . . . Account numbers and attributes for each of the 30 million base profit objects (in this case the client's accounts are recognized as base profit objects by TVA) . . . . These tables are updated each TVA processing cycle with new data from the client's systems of record. Although these tables are relatively few, they constitute a large amount of the data in the database.

(Ex. G at p. 7).

57.     Defendants practice the claimed step of providing a relational database management system operable in association with the computerized profit database, as recited in the Asserted Claims of the '137 and '316 Patents, as well as the claimed step of providing a relational database management system operable in association with a computer as recited in the Asserted Claims of the '521 Patent.

58.     By way of example, at least Grainger generates, furnishes, supplies, makes available, and/or prepares the TVA relational database management system with an "In Database Solution" focused design:



(2013 Teradata–Grainger Presentation);

> TVA calculates profitability by loading detailed data about the company's accounts, customers, relationships and activities into the TVA database. The user-defined rules are matched to the appropriate data sets and detailed calculations are performed. The result is the profit contribution for each of the items and relationships loaded into the database, along with a supporting audit trail.

(Ex. G at 2).

59.    Defendants practice the claimed step of preparing the profit information to be accessed electronically through the relational database management system including the step of calculating opportunity values for funds used or supplied by each object being measured, as recited in the Asserted Claims.

60.    By way of example, at least Grainger prepares its profit information for use by the TVA's selector engine:



(Ex. G at p. 4);

> The company can take detailed revenue and costing techniques to drive insights into their business. This includes HR costs, distribution and logistics costs, customers (A, B; but not C) and their profitability to the company. This data helps Grainger make daily decisions and gives them the visibility into the quarter—long before [traditional GAAP based] quarterly financial reports [are available].

(Ex. F at p. 2).

61.    Defendants practice the claimed step of establishing, in the relational database, rules for processing the prepared information, including the steps of providing information necessary to select objects and performing a profit calculus, as recited in the Asserted Claims.

62.     By way of example, at least Grainger uses the TVA to "change rules monthly, quarterly or annually to enhance business value." (Ex. F at p. 2) ("Expanded [from] 280 rules and calculations to over 530 within 5 months").

63.    The TVA's use of database established rules is discussed extensively in a 13-page technical overview Teradata makes available on its website (the "TVA Technical Overview"):

> All Balance Types, Products and Product Groups, Profit Object Attributes and Profit Object Events are user definable. Since these attributes are all available to be used in rule definitions and selection criteria, this gives the user a great deal of flexibility in defining selection criteria and allows for very specific database segmentation to which rules may be applied.

(Ex. G at p. 5).

64.    Defendants practice the claimed step of using the relational database management system to independently calculate at least one marginal value of profit for each object being measured using the established rules as applied to a selected set of prepared information, as recited in the Asserted Claims.

65.    By way of example, at least Grainger performs the claimed calculations through its use of the SQL-driven "In Database" TVA calculation engine:



(2013 Teradata–Grainger Presentation);

> The Calculation Engines use the results of the Selector Engine, Rule data and the client's operational data to calculate the results of each rule for each applicable Profit Object.

(Ex. G at p. 9);

> Because Rule Type and Calculation Type segment the Calculation Engine, significant processing efficiencies can be realized when running a set of rules. Rules of similar calculation types are automatically run in parallel. The architecture of the TVA Calculation Engine is designed for maximum processing efficiency while maintaining a detailed audit trail.

(Ex. G at p. 6).

66.     Defendants practice the claimed step of using the relational database management system to calculate a fully absorbed profit adjustment value for each object being measured, as recited in the Asserted Claims of the '512 and '137 Patents.

67.     By way of example, at least Grainger uses the TVA to generate output that can be fully reconciled to the General Ledger, which involves performing a fully absorbed profit adjustment value calculation:



(2013 Teradata–Grainger Presentation).

68.     Defendants practice the claimed step of combining the calculated values to create a measure for object level profitability, as recited in the Asserted Claims of the '316 Patent.

69.     By way of example, at least Grainger uses the TVA and/or related technologies to combine the values calculated by the TVA engine to arrive at and/or report on profitability measures for the contemplated objects:

> After calculating the results of the individual rules, the Calculation Engine goes through a process of aggregating the results by Profit Object and by scenario to arrive at a final profitability component value for each Profit Object in the database.

(Ex. G at p. 9);

> The result is the profit contribution for each of the items and relationships loaded into the database, along with a supporting audit trail. The results may then be aggregated, sorted and examined to any level of detail for additional analysis.

(Ex. G at p. 2);

> Grainger also leverages profitability analytics to support brand/segment profitability reporting and value-based contracting/customer profitability. The company can take detailed revenue and costing techniques to drive insights into their business. This includes HR costs, distribution and logistics costs, customers (A, B; but not C) and their profitability to the company. This data helps Grainger make daily decisions and gives them the visibility into the quarter—long before quarterly financial reports.

(Ex. F at p. 2).

> [TVA implementation] fully reconciled to the General Ledger and the supporting operating systems such as the loan, claims, fleet, billing systems and treasury systems.

(2013 Teradata-Grainger Presentation).

70.     The TVA relational database management system used by Defendants comprises a structured query language (SQL), as recited in certain Asserted Claims of each of the Asserted Patents.

71.     By way of example, the TVA calculation engines are SQL driven:



(Ex. G at 4).

72.     Teradata itself performs, and has performed, each of the foregoing steps, at least through its own internal and/or external usage and testing of the TVA and related technology.

73.     Defendants infringement has injured and will continue to injure B*IEOR and B*IEOR is entitled to recover damages adequate to compensate it for Grainger's infringement, which in no event can be less than a reasonable royalty.

74.     Teradata's direct infringement has been willful.

75.     Grainger's infringement has been willful to the extent it has known of the Asserted Patents and/or is willful to the extent it continues with its infringing actions having been made aware of this Complaint.

16

76. Teradata has had knowledge of the '521 Patent through, among other things, correspondence from B*IEOR expressly identifying the '521 Patent and a July 2010 meeting when the claims of the '521 Patent were discussed. (See Ex. D).

77. Teradata has had knowledge of the '137 and '316 Asserted Patents and/or has been willfully blind to their existence because: (i) Teradata has known of the '521 Patent—of which '137 and '316 Asserted Patents are related—since at least 2009; (ii) Teradata has been fully aware of B*IEOR's ongoing prosecution efforts for more than a decade; (iii) Teradata has taken the position that it is a licensee of B*IEOR's patent portfolio in the Limited Field Of Use; (iv) Teradata is a sophisticated corporation with dedicated, knowledgeable in-house and/or outside patent counsel; (v) Teradata prosecuted patents in the same technology field, but with later priority dates compared to the Asserted Patents, where Teradata was under an obligation to disclose the Asserted Patents or corresponding publications, applications, or the like; and (vi) information on the '137 and '316 Asserted Patents and their pending applications has been publicly available from the USPTO online database since as early as July 2009.

78. Teradata has known that its uses of TVA and/or related technologies infringe the Asserted Claims of the Asserted Patents.

79. B*IEOR is entitled to damages in accordance with 35 U.S.C. §§ 271, 281, and 284.

## COUNT II - INDUCED INFRINGEMENT

80. The allegations set forth in the foregoing paragraphs 1 through 79 are hereby re-alleged and incorporated by reference.

81. In violation of 35 U.S.C. §271(b), Teradata, with knowledge of the Asserted Patents at least as of the date of this Complaint and/or with willful blindness to the Asserted Patents, has knowingly induced infringement of the Asserted Patents with specific intent to do so by its activities relating to the marketing, distribution, and/or sale of the TVA and related technology

and infringing uses thereof, and by instructing and encouraging clients (including through product documentation) to operate and use TVA, Teradata database hardware, firmware, and related technology in an infringing manner with knowledge that these actions would infringe the Asserted Claims of the Asserted Patents.

82.     Client users of the TVA include at least Grainger, among others to be identified.

83.     At least Grainger performs the steps recited in the Asserted Claims and, thus, directly infringes those claims, as specified in Count I above.

84.     Teradata has had knowledge of the '521 Patent through, among other things, correspondence from B*IEOR expressly identifying the '521 Patent and a July 2010 meeting when the claims of the '521 Patent were discussed. (See Ex. D).

85.     Teradata has had knowledge of the '137 and '316 Asserted Patents and/or has been willfully blind to their existence because, among other things: (i) Teradata has known of the '521 Patent—of which '137 and '316 Asserted Patents are related—since at least 2009; (ii) Teradata has been fully aware of B*IEOR's ongoing prosecution efforts for more than a decade; (iii) Teradata has taken the position that it is a licensee of B*IEOR's patent portfolio in the Limited Field Of Use; (iv) Teradata is a sophisticated corporation with dedicated, knowledgeable in-house and/or outside patent counsel; (v) Teradata prosecuted patents in the same technology field, but with later priority dates compared to the Asserted Patents, where Teradata was under an obligation to disclose the Asserted Patents or corresponding publications, applications, or the like; and (vi) information on the '137 and '316 Asserted Patents and their pending applications has been publicly available from the USPTO online database since as early as July 2009.

86.     Teradata has known that Grainger's and other clients' uses of TVA and/or related technologies infringe the Asserted Claims of the Asserted Patents and has actively encouraged such clients to use TVA and/or related technologies in an infringing manner.

87.     Examples of Teradata's knowledge, active encouragement, and/or specific intent include the Teradata literature and presentation and promotional material referenced and quoted extensively in support of Count I above, indicating that Teradata instructs and encourages clients such as Grainger to use the TVA in an infringing manner. (See, for example, Paragraphs 54, 56, 58, 60, 62, 63, 65, 67, 68, 69, and 71 referenced above and incorporated by reference herein and Exhibits cited therein).

88.     By further example, the 2013 Teradata–Grainger Presentation refers to infringing features of the TVA that Teradata has identified and promoted in its marketing and/or training materials.



89.     The 2013 Teradata–Grainger Presentation also refers to numerous ways the TVA can be used to infringe, including through the use of, among other features, the ability to "measure the profitability of any object," "calculation engines," and "rules for customer profitability elements."



90.     The 2013 Teradata–Grainger Presentation also refers to "Sample Real World Results," Teradata has promoted. These results were derived from the RBC implementation B*IEOR participated in, and which represented the first commercial embodiment of Mr. Lepman's patented inventions.



91.     Examples of Teradata encouraging customers to use the TVA in an infringing manner can also be found in the TVA Technical Overview attached as Ex. G and made available

on Teradata's website. The TVA Technical Overview, quoted extensively with regard to Count I above, provides this summary of TVA on page 2:

> Teradata Value Analyzer (TVA) is Teradata's tool for calculating the profit contribution for all of a company's accounts, customers, relationships or other entities. This gives the management team the valuable information needed to understand and affect the profit dynamics of the business. TVA is not industry-specific; for example, it can be used by financial institutions, telecommunication companies, airlines or shipping companies to help manage their business.

(Ex. G. at 2).

92.     The TVA Technical Overview describes, for example, how profit contribution calculations can be "aggregated, sorted and examined to any level of detail for additional analysis." (Ex. G at p. 2).

93.     Teradata's infringement has injured and will continue to injure B*IEOR and B*IEOR is entitled to recover damages adequate to compensate it for Teradata's infringement, which in no event can be less than a reasonable royalty.

94.     Teradata's inducement has been willful.

95.     B*IEOR is entitled to damages in accordance with 35 U.S.C. §§ 271, 281, and 284.

## JURY DEMAND

96.     Plaintiff B*IEOR hereby requests a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

97.     Plaintiff B*IEOR respectfully requests that the Court find in its favor and against Defendants Grainger and Teradata, and that the Court grant B*IEOR the following relief:

(a) an adjudication that Defendants have directly infringed the Asserted Patents;

(b) an adjudication that Defendant Teradata has induced infringement of the Asserted Patents;

(c) a finding that Defendants' infringement is or has been willful;

(d) an award of damages adequate to compensate B*IEOR for Defendants' past infringement, and any continuing or future infringement through the date such judgment is entered, including prejudgment and post-judgment interest, costs, expenses and an accounting of all infringing acts including, but not limited to, those acts not presented at trial;

(e) an award of treble damages;

(f) a finding that this case is "exceptional" under 35 U.S.C. § 285 and awarding Plaintiff its expenses and attorneys' fees incurred in bringing and prosecuting this action; and,

(g) an award to Plaintiff of such further relief at law or in equity as the Court deems just and proper, including, but not limited to costs, fees, expenses, and/or interest.

Dated: October 16, 2017                     Respectfully submitted,

                                            /s/ Matthew Werber
                                            William Cory Spence
                                            Matthew A. Werber
                                            Jacob R. Graham
                                            SPENCE, P.C.
                                            405 N. Wabash Ave., Suite P2E
                                            Chicago, Illinois 60611
                                            312-404-8882
                                            William.Spence@spencepc.com
                                            Matt.Werber@spencepc.com
                                            Jacob.Graham@spencepc.com
                                            Counsel for Plaintiff
                                            B*IEOR