BERKELEY*IEOR d/b/a B*IEOR,    )
   )
        Plaintiff,    )
   )
        v.    )       17 C 7472
   )
TERADATA OPERATIONS, INC.,    )
W.W. GRAINGER, INC., DHL    )
EXPRESS (USA), INC., DANZAS    )
CORPORATION, d/b/a DHL GLOBAL    )
FORWARDING, AND AIR EXPRESS    )
INTERNATIONAL USA, INC.,    )
d/b/a DHL GLOBAL FORWARING    )
   )
        Defendants.    )

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

Before the Court are three motions to dismiss portions of Plaintiff Berkeley*IEOR's ("Berkeley") Second Amended Complaint ("SAC"), brought by (1) Defendant W.W. Grainger, Inc. ("Grainger"); (2) DHL Express (USA) ("DHL Express"); (3) Air Express International USA, Inc., ("Air Express"), and DHL Global Forwarding ("DHL Global") (collectively, "the non-Teradata Defendants"), and Defendant Teradata Operations, Inc., ("Teradata") (collectively, the "Defendants") pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the Court grants in part and denies in part all three motions.

Also before the Court are three motions to sever and stay portions of Berkeley's Second Amended Complaint. For the following reasons, the Court grants all three motions.

## BACKGROUND

The Court accepts as true the following facts from Berkeley's SAC. All reasonable inferences are drawn in Berkeley's favor. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

### A.    The Relevant Parties

Plaintiff Berkeley is a Nevada corporation that designs and develops large scale decision support systems. Richard "Tad" Lepman ("Lepman") is Berkeley's president and named inventor for U.S. Patent Number 7,596,521 (the "'521 Patent"), U.S. Patent Number 7,882,137 (the "'137 Patent"), and U.S. Patent Number 8,612,316 (the "'316 Patent) (the "Asserted Patents").

Defendant Teradata is headquartered in Ohio and provides database-management systems for data analytics. Teradata is a software and solutions company that offers a broad portfolio of data-analytical products and services to customers throughout various industries. These industries include financial services, retail, travel and transportation, communications, media, and entertainment.

Defendant Grainger is headquartered in Chicago and is a leading supplier of industrial products. These products include motors, lighting, fasteners, plumbing, tools,

and safety supplies. Grainger serves over three million customers through a network of branches, online channels, and distribution channels.

Defendant DHL Express is a leading air express and logistics company that provides an international service portfolio consisting of letter, parcel dispatch, and express delivery. DHL Express has been one of Teradata's customers since 2016. DHL Express' parent company is Deutsche Post AG and provides its services through this division.

Defendants Danzas and Air Express, while distinct entities, are both affiliated with DHL Express and are significant customers for Teradata. Danzas and Air Express both provide freight forwarding and packaging insurance. They also organize shipments worldwide. Danzas and Air Express' parent company is Deutsche Post AG and provides its services through this division.

## B.     The Asserted Patents

Lepman was the inventor of the patents-in-suit owned by Berkeley. He developed the method to provide a "granular," "object level" calculation of a business' profit. The patents-in-suit and alleged infringed claims are as follows:

> The '521 Patent, entitled "Process for Determining Object Level Profitability," is "a process for determining object level profitability," and claims in relevant part:
> 1. A process for determining object level profitability in a computer, comprising the steps of:
> > providing a relational database management system operable in association with a computer;
> > preparing information to be accessed electronically through the relational database management system;

establishing, in the relational database, rules for processing the prepared information;

using the relational database management system to independently calculate at least one marginal value of profit for each object being measured using the established rules as applied to a selected set of prepared information;

using the relational database management system to calculate a fully absorbed profit adjustment value for each object being measured; and

combining the at least one marginal value of profit and the fully absorbed profit adjustment value to create a measure for object level profitability.

2. The process of claim 1, wherein the relational database comprise a structured query language (SOL)

3. The process of claim 1, wherein the preparing step further includes the step of calculating opportunity values of funds used or suppled by each object being measured

4. The process of claim 1, wherein the establishing step includes the steps of providing the information necessary to select objects, and performing the correct profit calculus.

The '137 Patent, entitled "Process for Determining Object Level Profitability," claims in relevant part:

1.      A method for transforming a computerized profit database, comprising the steps of:

providing a computerized profit database having profit information;

providing a relational database management system operable in association with the computerized profit database;

preparing the profit information to be accessed electronically through the relational database management system, including the step of calculating opportunity values for funds used or supplied by each object being measured;

establishing, in the relational database, rules for processing the prepared information, including the steps of providing information necessary to select objects and performing  a profit calculus;

using the relational database management system to independently calculate at least one marginal value of profit for each object being measured using the established rules as applied to a selected set of prepared information;

using the relational database management system to calculate a fully absorbed profit adjustment value for each object being measured; and

combining the at least one marginal value of profit and the fully absorbed profit adjustment value to create a measure for object level profitability.

2. The process of claim 1, where the relational database comprises a structured query language (SQL)

The '316 Patent, entitled "Process for Determining Object Level Profitability," claims in relevant part:

1. A process for determining object level profitability in a relational database management system, comprising the computer implemented steps of:

providing a computerized profit database having profit information;

providing a relational management system operable in association with the computerized profit database;

preparing the profit information to be accessed electronically through the relational database management system, including the step of calculating opportunity values for funds used or supplied by each object being measured;

establishing, in the relational database, rules for processing the prepared information, including the steps of providing information necessary to select objects and performing a profit calculus;

using the relational database management system to independently calculate at least one marginal value of profit for each object being measured using the established rules as applied to a selected set of prepared information; and

combining the at least one marginal value of profit to create a measure of object level profitability.

2. The process of Claim 1, wherein the relational database comprises a structured query language (SQL)

## C.    The Underlying Action

In the 1990s, Berkeley was providing consulting services to Defendant Teradata's predecessor, NCR Corporation ("NCR").  Around this time, Lepman conceived the functional and technical ideas behind the inventions claimed in the Asserted Patents.  Berkeley and NCR subsequently built the first commercial embodiment of Lepman's inventions, which Royal Bank of Canada implemented in April 1999.  The commercial embodiment received much acclaim and was subsequently named the "Value Analyzer," or "Teradata Value Analyzer" (the "TVA").

TVA is a software application that allows a user to calculate the profit contribution for all of a company's accounts, customers, relationships, and other entities.  The software allows multiple profitability factors to be independently and simultaneously processed by a relational database management system.

On or about June 1, 1999, Berkley and NCR executed a licensing agreement, allowing NCR to sell certain implementations of TVA while restricting others.  In 2007, NCR spun off into a separate legal entity, giving birth to Defendant Teradata.[1]

On April 9, 1999, Lepman filed a provisional application to which the Asserted Patents claim priority.  On September 29, 2009, Berkeley sent Teradata a letter announcing the issuance of the '521 Patent.  In July 2010, Berkeley and Teradata met to discuss the '521 patent and the then-existing TVA implementations.  Berkeley alleges

---

[1] While not relevant to the underlying motions, Berkeley denies that Teradata and/or its parent company acquired NCR's rights under the License Agreement.  Berkeley does not seek remedies for acts of patent infringement falling within the licensing agreement's scope, nor are there any allegations that any party breached the licensing agreement.

that at this meeting, Teradata claimed that it and some of its customers were discontinuing its use of the TVA technology and were not infringing on the '521 patent. Despite such representation, Berkeley alleges Teradata and its customers continue using the TVA technology.

Sometime in 2010, Teradata partnered with Grainger "to implement new analytics capabilities utilizing Teradata's Active Enterprise Data Warehouse (EDW) platform and [TVA] software." Berkeley claims that the TVA object-level accounting method was custom-built and designed for use with Grainger's specific database.[2] In 2013, Grainger appeared in a write up on Teradata's website, making public its use of Teradata's technology and how it has benefited them.

Sometime in 2013, Teradata partnered with DHL Express. DHL Express embraced the TVA technology as a "costing and profitability engine." In a published article, DHL Express announced that "it chose to expand the existing Teradata solution, adding Teradata Value Analyzer as a costing and profitability engine, and the data warehouse as a repository and reporting platform for the output data." This program became known as "INSIGHT."

Danzas and Air Express are separate entities but are both divisions of Deutsche Post AG. Berkeley claims that, as divisions of Deutsche Post AG, both Danzas and Air Express would have access to the INSIGHT application.

_____

[2] The pleadings clearly state that Grainger uses and services the patented object-level accounting method itself, and not Teradata. However, the pleadings fail to clearly indicate if Berkeley or Teradata custom-built and designed the specific database.

On March 26, 2018, Berkeley filed its five-count SAC, alleging direct infringement of the Asserted Patents against: (i) Grainger; (ii) DHL Express; (iii) Danzas; and (iv) DHL Global. Specifically, Berkeley alleges that the non-Teradata Defendants directly infringed on claims 1-4 of the '521 patent, claims 1 and 2 of the '137 patent, and claims 1 and 2 of the '316 patent. Berkeley alleges violations of 35 U.S.C. §§ 271(a) and (g).

Berkeley also alleges indirect infringement against Teradata in Count IV, arguing that Teradata knowingly induced infringement of the Asserted Patents by marketing, distributing, and/or selling the TVA and related technology to Grainger, DHL Express, Danzas, and Air Express.

Teradata and the non-Teradata Defendants have filed a multitude of defenses in response. First, in three distinct motions, Teradata asks the Court to: (1) sever and stay Counts I, II, III, and IV against the non-Teradata Defendants, arguing that Teradata itself is the real party in interest; and (2) dismiss Berkeley's assertions of infringement under 35 U.S.C. § 271(g) in Counts II, III, and IV.

We first evaluate the non-Teradata Defendant's motion to sever and stay Counts I, II, III, and IV. While the Defendants bring three distinct motion, at its core, each argument is postured the same. Therefore, the Court will analyze the motions to sever and stay in a single discussion.

After a discussion on the non-Teradata Defendants' motion to sever and stay, we will then evaluate the various motions to dismiss.

## LEGAL STANDARD

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) "tests the sufficiency of the complaint, not the merits of the case." *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 878 (7th Cir. 2012). The allegations in the complaint must set forth a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Plaintiffs need not provide detailed factual allegations, but must provide enough factual support to raise their right to relief above a speculative level. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A claim must be facially plausible, meaning that the pleadings must "allow…the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The claim must be described "in sufficient detail to give the defendant 'fair notice of what the…claim is and the grounds upon which it rests.'" *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient to withstand a 12(b)(6) motion to dismiss. *Iqbal*, 556 U.S. at 678.

A district court's power to stay proceedings is well-established and "incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co., 299* U.S. 248, 254 (1936); *see also In re Groupon Derivative Litig.*, 882 F. Supp. 2d 1043, 1045 (N.D. Ill. 2012). The Court has "broad discretion" to decide

whether a stay is warranted. *Clinton v. Jones*, 520 U.S. 681, 706 (1997). When deciding whether to grant a stay, a court should "balance the competing interests of the parties and the interest of the judicial system" by considering the following three factors: (1) whether a stay will simplify the issues in question and streamline the trial; (2) whether a stay will reduce the burden of litigation on the parties and on the court; and (3) whether a stay will unduly prejudice or tactically disadvantage the non-moving party. *In re Groupon Derivative Litig.*, 882 F. Supp. 2d at 1045.

Courts in this district have "routinely applied this doctrine to stay patent infringement claims against customers in favor of resolving the patentee's claims against the upstream manufacturer first." *Mantissa Corp. v. Old Second Bancorp, Inc.*, 2018 WL 3059604, at *3 (N.D. Ill. 2018); *see also Select Retrieval, LLC v. ABT Elecs.*, 2013 WL 6576861, at *1 (N.D. Ill. 2013) (relying on customer-suit exception to grant stay of infringement claims against customers who were "end users" of allegedly infringing software, pending outcome of later-filed declaratory judgment action by developer of software). The Federal Circuit has also granted writs of mandamus directing district courts to stay proceedings on issues predicated on the customer-suit exception. *See In re Nintendo of Am., Inc.*, 756 F.3d 1363, 1364 (Fed. Cir. 2014) (relying on customer-suit exception in infringement suit against manufacturer and retailers of allegedly infringing product to grant a writ of mandamus directing district court to sever and stay patentee's claims against retailers).

## DISCUSSION

### I.      Motion to Sever

Defendants first contend that Counts I–IV should be severed and stayed. Berkeley advances three counter arguments: (1) a stay is inappropriate because the non-Teradata Defendants have "substantive knowledge and expertise in the use and implementation of the patented-object level accounting method;" (2) the customer-suit exception does not apply because it has alleged direct infringement against the non-Teradata Defendants and indirect infringement by Teradata; and (3) the traditional stay factors weigh against a stay. We evaluate each argument in turn.

### A.      Non-Teradata Defendants' Substantive Knowledge

Berkeley contends that a stay is inappropriate because the non-Teradata Defendants have "substantive knowledge and expertise in the use and implementation of the patented object-level accounting method." Specifically, Berkeley argues that the "patented object-level accounting method was custom built and designed for use with Grainger's, DHL Express', Air Express', and Danzas' specific database."

The non-Teradata Defendants argue that despite having the ability to modify and customize the TVA technology, Berkeley's infringement claims hinge on the implementation of the TVA technology itself. Therefore, because any implementations are derived exclusively from the TVA technology, Berkeley's argument must fail.

We agree with the non-Teradata Defendants that Berkeley's infringement claims appear to take issue with the implementation of the TVA technology itself, and not with

the ability to modify or customize it for a particular purpose. Berkeley has alleged that the non-Teradata Defendants have infringed on its TVA software by "perform[ing] a process for determining object level profitability as recited in the Asserted Claims of the '316 and '521 Patents and a process for transforming a computerized profit database as recited in the Asserted Claims of the '137 Patent." *See* Compl. ¶¶¶¶ 14, 21, 32, 42. In Berkeley's infringement action, it uniformly accuses the non-Teradata Defendants of utilizing the TVA technology and infringing on its use by carrying out asserted claims 1-4 of the '521 patent, 1 and 2 of the '437 patent, and claims 1 and 2 of the '316 patent.

In Count I, Berkeley contends that "Grainger performs the steps recited in the Asserted Claims in connection with their usage of the TVA." In Counts II-IV, Berkeley contends that DHL Express, Air Express, and Danzas "perform[] the steps recited in the Asserted Claims in connection with its usage of TVA / INSIGHT" technology. Therefore, Berkeley does suggest that other software, the INSIGHT, may be involved in DHL Express, Air Express, and Danzas' infringement contentions. However, Berkeley fails to explain how the INSIGHT technology is anything more than a specific implementation of the TVA technology. Thus, the non-Teradata Defendants correctly point out that Berkeley's infringement claims arise not out of some "custom-built" functionality of its TVA technology, but implementation of the TVA technology itself.

Berkeley's SAC suggests that INSIGHT is derived from the TVA technology itself. In fact, Berkeley states that DHL Express, Air Express, and Danzas added the

"Teradata Value Analyzer as a costing and profitability engine." This specific implementation became subsequently known as INSIGHT. Also, Berkeley has made uniform allegations that the non-Teradata Defendants have infringed on the Asserted Patents by carrying out asserted claims 1-4 of the '521 patent, 1 and 2 of the '437 patent, and claims 1 and 2 of the '316 patent. It is also telling that, while accusing the non-Teradata Defendants of infringement, Berkeley has not suggested that the infringement occurred because of the "custom built" technology. Indeed, based on the posture of its SAC, it would not be credible for Berkeley to claim otherwise.

It is apparent that the implementation of INSIGHT relies almost exclusively on the TVA technology. In *In re Google Inc.*, the Federal Circuit directed the district court to stay infringement proceedings against customer, stating that by denying the stay, the district court "relied heavily on each mobile phone manufacturer's ability to modify and customize the Android platform to its own particular purpose." 558 Fed. Appx 988, 990 (Fed. Cir. 2014). However, the Federal Circuit noted that the claims should nonetheless be stayed because the infringement's contentions against all defendants relied "almost exclusively on the underlying functionalities provided in the base Android source provided by Google." *Id.* Here, Berkeley fails to demonstrate in its responsive pleadings how the implementation of INSIGHT does not exclusively rely on the TVA technology.

Accordingly, this Court is not persuaded that a stay is inappropriate because non-Teradata Defendants alleged "substantive knowledge and expertise in the use and implementation of the patented object-level accounting method."

## B.      Customer-Suit Exception

Defendants argue that this case should be stayed under the customer-suit exception because Teradata is the manufacturer, seller, and distributor of the allegedly infringing process technology. Defendants assert that at issue is solely Teradata's TVA software product. Therefore, Defendants claim that if Teradata's accused TVA product is found to not infringe on the limitations of the asserted claims,[3] the matter against the non-Teradata Defendants inherently solves itself. Conversely, if Teradata is found to infringe, Defendants concede that the sole remaining issue for this Court to resolve is what liability attaches to each defendant.

Berkeley contends that the customer-suit exception is inapplicable because it has alleged direct infringement against the non-Teradata Defendants and indirect infringement by Teradata. Therefore, it is Berkeley's position that the non-Teradata Defendants are all necessary parties to this action. Berkeley argues that adjudication of the claims against Teradata will not necessarily resolve the claims against Grainger, DHL Express, Danzas, and Air Express because the specific issues of infringement are not entirely common.

---

[3] Or, if by later motion the claims are deemed invalid.

The purpose of staying the customer suit is "to avoid, if possible, imposing the burdens of trial on the customer, for it is the manufacturer who is generally the 'true defendant' in the dispute, while the customer is simply a downstream retailer or end user of the allegedly infringing product." *Mantissa Corp. v. Old Second Bancorp, Inc.*, 2018 WL 3059604, at *3 (N.D. Ill. 2018) (quoting *In re Nintendo of Am., Inc.*, 756 F.3d at 1365); *see also Codex Corp. v. Milgo Elec. Corp.*, 553 F.2d 735, 737–38 (1st Cir. 1977) ("At the root of the preference for a manufacturer's declaratory judgment action is the recognition that, in reality, the manufacturer is the true defendant in the customer suit."). The "guiding principles" underlying the customer-suit exception are efficiency and judicial economy. *Spread Spectrum Screening LLC*, 657 F.3d at 1357.

We are persuaded that the customer-suit exception applies. As an initial matter, we find that although Berkeley is suing Teradata and the non-Teradata Defendants in the single complaint, the customer-suit rationale applies because Teradata is the true defendant. *See In re Nintendo of Am., Inc.*, 756 F.3d at 1365 (finding that the customer-suit exception applies despite the manufacturer and customers being sued in the same single complaint).

The customer-suit exception is most apt "where the customer is accused of directly infringing apparatus claims, because the manufacturer's liability will necessarily turn on whether the accused product satisfied every limitation of those claims, and a resolution of that issue in the manufacturer's suit will also resolve whether the customer infringes." *Mantissa Corp.*, 2018 WL 3059604, at *5. Therefore, the

Court recognizes that the underlying motion is of a somewhat different paradigmatic case than the typical customer-suit exception case.  However, the Court is still satisfied that the exception applies.  *See In re Nintendo of Am., Inc.*, 756 F.3d at 1365 (applying the customer-suit exception notwithstanding that "the circumstances of this case differ from those of the customer-suit exception," concluding that "we agree with the district court that the same general principles govern in that Nintendo is the true defendant").

While Berkeley correctly points out that in *Erfindergemeinschaft Uropep GbR v. Eli Lilly and Company, and Brookshire Brothers, Inc.*,  the court refused to apply the customer-suit exception to a situation where the customer was accused of direct infringement and the manufacturer accused of indirect infringement, this is not a strict rule. 2016 WL 1659924, at *1 (E.D. Tex. 2016);  *see also Card Activation Techs.*, 2009 WL 2956926, at *3 (finding "without merit" the argument that the customer-suit exception "does not apply to method patents").

As discussed in great lengths above, the baseline analysis is the application of the asserted claims construed against the TVA technology.  Berkeley has failed to demonstrate that its infringement claim is predicated upon the specific implementations of its TVA technology.  Instead, Berkeley's infringement claims appear to be based solely on the functionalities of the TVA technology itself and the TVA's ordinary use of "determining object level profitability."   Accordingly, because Teradata is the manufacturer and seller of the TVA technology, we find that the customer-suit exception applies.

## C.    Traditional Stay Factors

The traditional stay factors also align with our conclusion that a stay is warranted. First, we agree with the non-Teradata Defendants that staying Counts I-IV will simplify the issues in question. By deciding first whether the TVA technology infringed on the Asserted Patents, there is the potential that all substantive issues regarding Grainger, DHL Express, Danzas, and Air Express will be resolved. While Berkeley correctly states that some issues may remain if this Court orders a stay, resolution of the infringement claim against Teradata may potentially resolve the "major issues" against the downstream retailers. *See Katz v. Lear Siegler, Inc.*, F.2d 1459, 1464 (Fed. Cir. 1990). As mentioned, it appears from Berkeley's SAC that INSIGHT is predicated upon the implementation of the TVA technology itself, and not the customization of it. Therefore, if the TVA technology does infringe on the Asserted Patents, the sole issue this Court must decide is damages for the underlying infringement

Second, staying Counts I-IV will reduce litigation burden. The case is still in its early stages, as it was initially filed on October 16, 2017. Berkeley filed its SAC March 26, 2018. A preliminary assessment of whether the TVA technology has infringed on the Asserted Patents may subsequently eliminate the need for additional responsive pleadings, and fact and expert discovery.

Third, this Court is not persuaded that Berkeley would be unduly prejudiced or tactically disadvantaged if Counts I-IV are stayed. The baseline analysis is the application of the asserted claims as construed against the TVA technology. There is

significant overlap between what the non-Teradata Defendants can offer compared to what Teradata itself can produce. Therefore, this Court finds that there is no need to involve the non-Teradata Defendants at this time when each utilize the baseline TVA technology.

## D. Motion to Sever

The Court also finds that a severance is appropriate. In analyzing whether a claim should be severed, courts consider whether: "(1) the claim to be severed is peripheral to the remaining claims; (2) the adjudication of the remaining claims is potentially dispositive of the severed claims; and (3) the transfer of the remaining claims otherwise is warranted under § 1404(a)."[4] *MGT Gaming, Inc. v. WMS Gaming, Inc.*, 978 F. Supp. 2d 647, 664 (S.D. Miss. 2013).

First, we find that Teradata is the real party of interest, making the non-Teradata Defendants peripheral under the customer-suit exception. Second, as discussed in great detail above, adjudication of the alleged TVA infringement may potentially be dispositive for all of the non-Teradata Defendants.

For these reasons, we grant Defendants' motion to sever and stay.

## II. Motion to Dismiss

The Defendants bring a variety of arguments seeking to partially dismiss Berkeley's SAC. First, Air Express and Danzas seek to dismiss Counts III and IV,

---

[4] The non-Teradata Defendants are not seeking to transfer this case. Therefore, the third prong is not analyzed.

claiming that the SAC improperly conflates DHL Express, Danzas, and Air Express. Second, the Defendants argue that Counts II-IV should be dismissed because Berkeley has failed to properly allege a claim under 35 U.S.C. § 271(a). Third, the Defendants argue that, in the alternative, Counts II-IV should be dismissed because the SAC fails to sufficiently allege a claim under 35 U.S.C. §271 (g).

### A.    Group Pleading

Air Express and Danzas seek dismissal of Counts III and IV claiming that the SAC improperly conflate DHL Express, Danzas, and Air Express.  Specifically, Air Express and Danzas claim that Berkeley fails to state a proper patent infringement claim because Berkeley creates a fictional proxy, "DHL," when stating its cause of action. We disagree.

"Group pleading" does not violate Federal Rule of Civil Procedure 8 so long as the complaint provides sufficient detail to put the defendants on notice of the claims. *See Sanders v. JGWPT Holdings, Inc.*, 2016 WL 4009941, at *10 (N.D. Ill. 2016) ("'Group pleading' that refers to 'Defendants' collectively is sufficient under Rule 8 when a plaintiff provides enough detail about the allegations to put each defendant on fair notice of the claims.").

The SAC clearly articulates that "on information and belief, Danzas performs the steps recited in the Asserted Claims in connection with its usage of TVA / INSIGHT and related activity," and that "on information and belief, Air Express performs the

steps recited in the Asserted Claims in connection with its usage of TVA / INSIGHT and related claims."

Danzas and Air Express are divisions of Deutsche Post AG, DHL Express' parent company. As a division of Deutsche Post AG, it is plausible that Danzas and Air Express each would have access to the INSIGHT application. It is also plausible that Danzas and Air Express, both shipping and logistic companies, would seek the profitability and margin data generated by INSIGHT. This is especially plausible because DHL Express has made public its use of the INSIGHT technology.

Also, Berkeley has showed evidence of Danzas and Air Express each posting job openings for "Air Freight Specialist[s]," a vacancy requiring "implementation [of] appropriate pricing for DHL Air Freight products and services."

Accordingly, Danzas and Air Express have sufficient notice, and Berkeley's SAC is sufficiently tailored to Danzas and Air Express.

**B.      35 U.S.C. § 271 (a)**

In its reply brief, the Defendants argue that Counts II-IV should be dismissed because Berkeley has failed to properly allege a claim under 35 U.S.C. § 271 (a). However, the Defendants have waived this argument as they did not attempt to argue it in their opening briefs. *See United States v. Miles*, 244 F. App'x 31, 33–34 (7th Cir. 2007) (stating that arguments not developed in the opening brief are waived).

Therefore, the Court will not address this issue.

## C.    35 U.S.C. § 271 (g)

Defendants contend that Counts II, III, and IV under § 271(g) should be dismissed because its alleged infringing process does not make a "product" that is imported into the United States.  Instead, the Defendants contend that the asserted claims are limited to "object level profitability," failing to claim a physical product or even a "report."    Therefore, because Defendants argue that the "object level profitability" is data and not tangible information, Berkeley's claim must dismissed because § 271(g) is inapplicable.

Berkeley argues that § 271(g) is applicable because its patented method-generated Profitability Records and Profitability Reports qualify as "product[s]" under § 271(g).   Berkeley contends that the Defendants have performed "the patented steps of the asserted patents to make calculated object level profitability values." Specifically, Claim 1 of each of the Asserted Patents each contemplate that the "calculated values of the Profitability Records will be written to, or otherwise present in, a relational database, given that the claims require they be calculated in a 'relational database management system.'"

In *Bayer AG v. Housey Pharmaceuticals, Inc.*, the Federal Circuit found that the statutory prohibition on the importation or sale of a product "made" by a patented process applies only to "physical products" that are "manufactured," and does not extend to "information" produced by a patented process. 340 F.3d 1367, 1371–72 (Fed. Cir. 2003).   The Defendant owned a patent claiming "a method of screening for

substances which specifically inhibit or activate a particular protein affecting the cultural or morphological characteristics of the cell expressing the protein." *Id.* at 1369. The patent-holder alleged infringement under § 271(g), asserting that the method patents used a process to identify which drug to produce. *Id.* The issue was whether the research data from the performance of a method to identify substance, was a product which is made by a process. *Id.* at 1370. The Federal Circuit said no, explaining that the process did fall within the scope of the processes of "manufacture" discussed in the statute. *Id.* at 1372.

Notwithstanding *Bayer*, Berkeley relies on *CNET Networks, Inc. v. Etilize, Inc.*, 528 F. Supp. 2d 985 (N.D. Cal. 2007) and *Ormco Corp. v. Align Technology, Inc.*, 609 F. Supp. 2d 1057 (C.D. Cal. 2009) for the proposition that digital creations can constitute products within the meaning of § 271(g).

In *CNET Networks*, the patent concerned claimed methods and systems for automatically creating an electronic catalog of product information gathered from various internet websites. *Etilize, Inc.*, 528 F. Supp.2d 985 (N.D. Cal. 2007). The court found that the digital catalogue was a product within the meaning of § 271(g) because the infringing method was used to create a product – the catalogue – which was subsequently imported into the United States. *Id.* The court explained that this was unlike *Bayer* because *Bayer* dealt with an infringing process that performed a service of transmitting information to recipients in the United States. *Id.*

Likewise, in *Ormco Corp. v. Align Technology, Inc.*, the court concluded that a three-dimensional digital representation of teeth transmitted to recipients was a "'creation' produced by 'practicing each step' of patented process." 609 F. Supp. 3d 1057 (C.D. Cal. 2009)

The Court finds that the "profitability records" asserted by Berkeley do not qualify as "products" under § 271(g). Claim 1 of the '521 patent covers a "process for determining object level profitability in a computer … ," resulting in a "process for determining object level profitability." Claim 1 of the '137 patent addresses a "method for transforming a computerized profit database … ," resulting in "a measure for object level profitability." Claim 1 of the '361 patent discusses a "process for determining object level profitability" with the same result.

We find that the method claim of "determining object level profitability" is more aligned with *Bayer* in that the claims provide a more efficient means of measuring profitability, which we find is not a tangible component. Profitability is defined as "the excess of returns over expenditure in a transaction or series of transactions; especially the excess of selling price of goods over their cost." *Profit*, Merriam-Webster's Dictionary (2018), https://www.merriam-webster/com/dictionary/profit. The Defendants correctly point out that calculated profitability exists irrespective of whether the method is applied, and that the method claims do not necessarily "create" anything new.

The Court is not persuaded by Berkeley's argument that the "profitability records" are tangible goods within the meaning of § 271(g). Instead, the Court agrees with the Defendants that the "profitability records" are not the result, or manufactured as a result, of the claims. Indeed, the "profitability records" are an element of the process and a pre-existing element of the claims that subsequently leads to the "process for determining object level profitability." Therefore, we find that the "profitability records" are not "physical products" that are "manufactured" for purposes of § 271(g).

## CONCLUSION

For the reasons above, the Defendants' motion to sever and stay is granted. The 12(b)(6) motion is granted in part and denied in part. The claims arising under 35 U.S.C. § 271(g) in Counts II-IV are dismissed. The Counts remain to the extent they state claims under U.S.C. § 271(c).

Dated: 3/7/2019

Charles P. Kocoras
United States District Judge