IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BERKELEY*IEOR d/b/a B*IEOR, | ) | |
| a Nevada Corporation, | ) | |
| | ) | |
| Plaintiff, | ) | No. 17 C 7472 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| TERADATA OPERATIONS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

After a rather contentious several months, the parties pared down and crystalized their discovery disputes to a point that they could finally be addressed in an appropriate motion to compel. The plaintiff has filed that motion [Dkt. #219], and, for the following reasons, it is granted in part and denied in part.[1]

**A.**

First, we have the Rule 30(b)(1) and Rule 30(b)(6) depositions of Nancy Kalthoff. Ms. Kalthoff is a former Teradata employee, who consented to be deposed. Berkeley wanted the depositions to be live and suggested that they could be done near her home in California. [Dkt. #223-1, Page 22/49]. Ms. Kalthoff agreed as long as everyone was masked and gave her availability as August 5th and 6th or August 10th and 11th.[2] But Berkeley refused to do consecutive days due to child

---

[1] For some reason, Teradata's lead argument against the motion to compel is that it is untimely. The Order of July 9, 2021, however, allowed a motion to compel on issues remaining after the parties' negotiations. [Dkt. #214].

[2] Counsel for Teradata stated that they didn't think two full 7-hour sessions would be necessary and indicated the second day was available for "overflow." Of course, Berkeley is entitled to both a full 30(b)(1)
(continued...)

custody issues for one of its attorneys. [Dkt. #220, at 4]. Thus, these issues would require opposing counsel to make four 1800-mile airline trips between Chicago and California.

For reasons that are all too obvious, as the Summer drew on – and by the time Berkeley filed its motion to compel on July 23rd – live depositions, which were an unnecessarily risky idea in the first place, became a bad idea. And the thought of multiple airline trips to take the depositions became a terrible and unacceptable one. The pandemic continues, and new cases and hospitalization numbers have again soared, as a more contagious and virulent variation of the virus is sweeping across the County – and the world – with terrifying results, causing some local governments to reinstitute restrictions on all facets of daily living. Berkeley's unamplified assertion that there have been "improvements in COVID-19" [Dkt. #223, at 2], is essentially meaningless in the present context and ignores the reality of what is occurring in the country today.[3]

At the time Berkeley filed its motion to compel at the end of July, Teradata's position was clear – and responsible:

> we do not think it is appropriate to take the depositions a week apart. Asking the parties to travel twice for a deposition that could be completed on one day is inappropriate, especially given the continued rising cases of covid. I understand that there are issues for Cory with an extended stay in California, but to that extent the deposition could be completed remotely.

[Dkt. #220-3]. Indeed, this position is in harmony with the literally scores of cases reported in Westlaw that have refused to allow attorneys to take in-person depositions as opposed to video

---

[2](...continued)
and full 30(b)(6) deposition.

[3] Although made in another context, Judge Easterbrook's comments in *Israel Travel Advis. Serv. v. Israel Iden. Tours*, 61 F.3d 1250, 1259 (7th Cir. 1995) fairly describe the plaintiff's claim of "improvements in COVID-19": : "So What?...Who cares?...True, but irrelevant."

depositions during the worldwide pandemic. *See infra* at 4. Berkeley has nonetheless deemed the defendant's resistance unreasonable. [*See* Dkt. #220, at 2 ("Teradata continues to refuse to present its fact witness and its Rule 30(b)(6) witness, Kalthoff, in a reasonable manner.")]. Its motion asks the court to compel two live depositions, on August 5th and 11th in California near Ms. Kalthoff's home. [Dkt. #220, at 5]. That request is denied; we simply cannot and ought not ignore the dire circumstances posed by the pandemic.

It bears repeating that courts cannot ignore the setting in which they are called upon to make a decision regarding the permissibility of contemplated conduct, for "the character of every act depends on the circumstances in which it is done." *Schenck v. United States*, 249 U.S. 47 (1919)(Holmes, J.). *Accord EEOC v. Indiana Bell Telephone Co.*, 256 F.3d 516, 532 (7th Cir. 2001). Prior to the pandemic, some courts had expressed a "preference" for live depositions and direct lawyer participation in them. *See, e.g.. Nygard v. DiPaolo,* 753 F. App'x 716, 725 (11th Cir. 2018); *Almonacid v. Cessna Aircraft Co.*, 2012 WL 1059681, at *1 (D. Kan. 2012). But a preference is just that, a preference. No more. And, "general propositions do not decide concrete cases." *Lochner v. New York*, 198 U.S. 45, 76 (1905)(Holmes, J., dissenting).

Thus, defendant's repetition of these general principles have limited utility in the present setting in which we find ourselves. "The 'black letter' rules that restaters and treatise writers derive from common law decisions are usually...generalizations that yield to the particulars of the individual case." *Rockstead v. City of Crystal Lake*, 486 F.3d 963, 966 (7th Cir. 2007). *See also United States v. Costello*, 666 F.3d 1040, 1050 (7th Cir. 2012)("a general proposition will often as a matter of semantics cover facts remote from those of the case in which the proposition is stated, yet the court that stated it might qualify or refine it when confronted with significantly different facts."). In short,

the cases in which a preference for "live" depositions was expressed were never intended to apply to the kind of dramatic and dangerous situation facing the County and the World today, and thus they do not control the present case.

### B.

Plaintiff's motion overstates the necessity of having lawyers be physically present if the deposition is to have real worth. It should be recalled that depositions in cases at law did not even make their appearance in the federal system until 1935 with the advent of the Federal Rules of Civil Procedure. *See Ty, Inc. v. Target Corp.*, 2021 WL 1885987, at *4 (N.D. Ill. 2021). Before then, even though there was no discovery, the bar prospered and flourished and justice was deemed to be amply served. Thus, it simply cannot be properly asserted that unless there are "live" deposition with lawyers physically present cases simply cannot be decided properly. Judge Posner has rightly said that "[e]veryone exaggerates the importance of his or her own activity...." *Yatvin v. Madison Metropolitan School District,* 840 F.2d 412, 420 (7th Cir. 1988). Lawyers are no exception. *Id*. (And neither are judges for that matter). And thus, it is perhaps understandable that the physical presence of a lawyer at a deposition has been thought by some to be a necessary adjunct to the pursuit of truth. The reality, as recent circumstances have shown, is that cases ultimately do not depend on or demand the physical presence of a lawyer at a deposition as a prerequisite to the ascertainment of truth or the achievement of justice. Thus, we need not slavishly honor requests like that of the plaintiff demanding in person depositions even in the midst of a worldwide pandemic.

Finally, it cannot be too strongly stressed that depositions by remote means have been a feature of federal practice for many years. Their increased usage given the current pandemic should come as no surprise. *See, e.g.,* Fed.R.Civ.P. 30(b)(4); *Ty, Inc., supra.; Mosiman v. C & E*

*Excavating, Inc.*, 2021 WL 1100597, at *2 (N.D. Ind. 2021)("Overall, the twin aims of preventing the spread of the virus and protecting the health and safety of all involved provide 'good cause' to hold the deposition remotely."); *In re Broiler Chicken Antitrust Litig.*, 2020 WL 3469166, at *7 (N.D. Ill. 2020)("Courts have long held that leave to take remote depositions pursuant to Rule 30(b)(4) should be granted liberally."); *Valdivia v. Menard Inc.*, 2020 WL 4336060, at *1 (N.D. Ill. 2020)(". . . courts in this district and others have found that the health concerns created by the COVID-19 pandemic are a legitimate reason to take a deposition by remote means."); *Sonrai Sys., LLC v. Romano*, 2020 WL 3960441, at *3 (N.D. Ill. 2020) (health concerns created by the COVID-19 pandemic create "good cause" for order requiring remote deposition); *Smid v. Molex, LLC*, 2020 WL 6132221, at *1 (N.D. Ill. 2020); *Grano v. Sodexo Mgmt., Inc.* 335 F.R.D. 411 (S.D.Cal. 2020).

The wisdom under the present circumstances of a party demanding a live deposition of a witness and requiring opposing counsel to make four 1800-mile airline trips is questionable – to say the least. Not only the "optics," but the reality of the situation are even worse as the plaintiff is demanding two separate round-trips to California for the convenience of one of its attorneys. [Dkt. #222, at 4].[4] As indicated, this portion of Berkeley's motion is denied. Ms. Kalthoff's deposition can be taken by video conference as can the 30(b)(1) and 30(b)(6) depositions. And, again, to be clear, Berkeley is entitled to two seven-hour sessions if need be. The dates of these depositions will be decided upon by counsel for both sides.

---

[4] By the time Berkeley filed its reply brief, it insisted that it "steadfastly supports and complies with all local, state, and federal mandates" and offers to negotiate alternative means "[t]o the extent any proposed deposition . . . becomes untenable . . . ." [Dkt. #223, at 3]. This "offer" most assuredly does not solve the present dispute.

## C.

Berkeley also seeks to compel the depositions of two other non-party witnesses. On January 5, 2021, Berkeley noticed the depositions of fact witnesses, Paul Phibbs and Annette Neeson, pursuant to Rule 30(b)(1). [Dkt. #220-14]. Within a week, Teradata informed Berkeley that Mr. Phibbs and Ms. Neeson were no longer Teradata employees, and that the defendant's lawyers did not represent them. [Dkt. #222-4]. But they provided Berkeley with their contact information. [Dkt. #222, at 8].[5] That meant Fed.R.Civ.P 45 was applicable, not Fed.R.Civ.P. 30. *See Freeman v. Molding Prod.*, 2020 WL 1983696, at *4 (N.D. Ind. 2020); *Spina v. Forest Pres. of Cook Cty.*, 2001 WL 893842, at *2 (N.D. Ill. 2001); *Tome Enginharia E. Transportes, Ltda v. Malki*, 1999 WL 1024543, at *2 (N.D. Ill. 1999). But, Berkeley dug in, and refused to subpoena the two witnesses for months. In Berkeley's view, because former employee, Ms. Kalthoff, *agreed* to sit for depositions, former employees, Mr. Phibbs and Ms. Neeson, ought to have made the same concessions. [Dkt. #220]. But they didn't – and they were not obligated to do so. *Spina*, 2001 WL 893842, at *2. Berkeley had about five months to subpoena the two witnesses before discovery closed. It didn't even attempt to do so. Without a subpoena having been properly and timely served, a court simply cannot compel the two non-party witnesses to attend depositions. This portion of Berkeley's motion is also denied.

That leaves the document designation issue that the parties have been struggling with for over a year. Teradata's document production has amounted to about 23,000 documents. As the parties

---

[5] Inexplicably, Berkeley claims that Teradata informed it of the need to subpoena the two witness only recently. [Dkt. #220, at 6].

6

continued to battle over the designation of some of those documents as "Highly Confidential" as opposed to merely "Confidential," the exact number of documents at issue changed. While that number is difficult to determine precisely from the parties' submissions, suffice it to say it is a tiny fraction of the total production. We do know that the parties have finally hammered out a stipulation from Mr. Lepman that neither he nor Berkeley are currently a competitor to Teradata or the TVA product and were not currently working to create a product that competes with TVA. [Dkt. #207-1].

In addition, he agreed that neither he nor Berkeley (nor any other company in which he owns 50% or more of the equity) would compete with Teradata for two years after the completion of this litigation, would not use any of Teradata's information for any purposes other than this litigation, and would either return all of Teradata's documents to Teradata's counsel or destroy all copies. [Dkt. #207-1]. In exchange, Teradata agreed to allow him to "review the less than 900 (out of a production of 23,000 documents) Highly Confidential documents at issue, with the exception of TVA installation files, source code, and documentation related to the Vantage product." [Dkt. #200, at 3]. But Berkeley never agreed to that part; it wanted *all* the documents. And, it is upset that "less than 900 documents" turned out to be 758 documents, or 6/10 of one percent of Teradata's total document production. So, 142 documents are *still* at issue over a year later.

Under the Default Confidentiality Agreement, "'Highly Confidential' information is information . . . that is current or future business or technical trade secrets and plans more sensitive or strategic than Confidential information, the disclosure of which is likely to significantly harm that person's competitive position . . . ." To support its refusal to allow access to those last 142 (or so) documents, Teradata relies on the second clause: that disclosure of the last 142 documents would significantly harm its competitive position. [Dkt. #222, at 9, 10]. But, then what was the point of the

7

stipulation and the year-long ordeal that finally led to it? Teradata wouldn't redesignate the other 758 documents – designated "Highly Confidential" due to potential for competitive harm if Mr. Lepman had access to them – unless Mr. Lepman stipulated that he wasn't competing with Teradata and would not do so for two years after this case was over. I fail to see the distinction between the 758 document Teradata claimed were highly sensitive documents and the 142 highly sensitive documents left at issue, unless, as Berkeley has been claiming all along, Teradata "over-designated" the 758 in the first place. The stipulation – drafted, in the main, by Teradata – and the arduous process that went into it have to have some meaning. Teradata's stance robs it of any. This portion of Berkeley's motion is granted, and Teradata must produce the remaining documents – as well as TVA customer contracts – subject to the stipulation. Teradata has waived any argument it might have had regarding production of those contracts by failing to raise it in response to Berkeley's motion. [Dkt. #220, at 2, 6, 8]. *Ennin v. CNH Indus. Am., LLC*, 878 F.3d 590, 595 (7th Cir. 2017); *Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1078 (7th Cir. 2016).

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 8/12/21

8